## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOUREY NEWELL,** individually and on behalf of all others similarly situated,<br><br>       *Plaintiff,*<br><br>*v.*<br><br>**RXLINK INC.**<br><br>       *Defendant.* | Case No.<br><br>2:25-cv-4270-MRP<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**Plaintiff's Response in Opposition To Defendant's Motion To Dismiss**

## I.    INTRODUCTION

In support of its motion to dismiss the Plaintiff's claims for violations of the Telephone Consumer Protection Act's Do Not Call requirements, Defendant advances arguments that run contrary to the statutory text, Congressional intent, and TCPA-specific case law. Defendant's motion to dismiss must be rejected, as the growing body of law counsels.

## II.    FACTUAL BACKGROUND

Plaintiff Jourey Newell filed this Amended Class Action Complaint on July 29, 2025, alleging violations of the Telephone Consumer Protection Act (TCPA) by Defendant RxLink Inc. (ECF 1). That Complaint alleges violations of the TCPA's DNC requirements.

## III.    LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

## IV.    ARGUMENT

*A.    Section 227(c) of the TCPA provides a private right of action for text messages, which are "calls."*

Consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The

TCPA prohibits sending text messages to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls. Of course, text messaging didn't exist yet when the TCPA was passed in 1991, so Congress didn't have SMS messages specifically in mind. But that is no matter: The plain meaning of the word "call" in the TCPA has long been understood to encompass any attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003). And this Court has already held the TCPA applies to text calls, including involving Mr. Newell his very self. *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 582 (E.D. Pa. 2025). *Newell* is not an outlier here. *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *4 n.4 (E.D. Pa. Mar. 14, 2025) ("Under the TCPA, text messages are considered 'calls.'") (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 153 (2016)); *Perrong v. Chase Data Corp.*, No. CV 22-2628, 2024 WL 329933, at *2 (E.D. Pa. Jan. 26, 2024) (same). A growing number of courts addressing the issue have concluded that the TCPA applies to text messages. *See, e.g.*, *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2–3 (N.D. Ill. 2025); *Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos Fin.*, *LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025); *Esquivel v. Mona Lee, Inc.*, No. 3:25-CV-00607, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025).

RxLink insists no one describes texts as "telephone call[s]" in "ordinary conversation." (MTD at 8.) That's not how statutory interpretation works. Courts look to statutes' ordinary "meaning at the time of … adoption" to interpret them, not "modern intuition." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). Modern parlance can be misleading as times change. *See id.* at 114-16. RxLink also has no answer for the TCPA's autodialer provisions, which uses "call" to refer to written messages received on a pager, the precursor technology to text messaging that

existed in 1991, and which would have displayed an incoming message as written text. *See* 47

U.S.C. § 227(b)(1)(A)(iii). If a text "call" to a pager can violate the TCPA, a text "call" to a cell

phone can too, because it shows "that the term 'call' cannot invoke only the common usage … in

which a 'call' refers to oral communication between two parties via telephone." *Lozano v.*

*Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1004–05 (N.D. Ill. 2010).

The guiding purpose of a Do Not Call List is "to protect residential telephone

subscribers' privacy rights to avoid receiving telephone solicitations to which they object." *Id.*

§ 227(c)(1). The key operative term is "telephone solicitations," which are defined in the TCPA

as "the initiation of a telephone call *or message* for the purpose of encouraging the purchase or

rental of, or investment in, property, goods or services, which is transmitted to any person." *Id.*

§ 227(a)(4). That definition is "more concerned with the purpose of the telephone

communications than the form in which those communications are transmitted." *Medvidi*, 2025

WL 2856295, at *3. Apart from being wrong as a matter of statutory construction, RxLink's,

*Jones'*, and *Davis'* interpretation ignores another important admonition: "[I]t is ultimately the

provisions of our laws rather than the principal concerns of our legislators by which we are

governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). "Defendant's

invitation to inject a distinction between written and oral telephone solicitations is contrary both

to the remedial bent of the TCPA and precedent." *Id.* It also contravenes the long-established

precedent on the remedial purposes of the TCPA. *Esquivel*, 2025 WL 3275607, at *3.

     i.    <u>The text of the TCPA confirms that the term "call" includes text messages.</u>

RxLink contends that a single use of the phrase "telephone call" in section 227(c)(5)'s

private right of action means that the Do Not Call List rules cannot apply to text messages.

That's incorrect. The plain meaning of the word "call," long recognized by other courts and the

FCC, refutes that argument. *Id.* The statutory context confirms that a text can be a "call." And RxLink's arguments in support of its contrary interpretation do not withstand scrutiny.[1] To interpret a statutory term, courts look to its "ordinary meaning" "at the time Congress enacted the statute," referencing dictionaries of the era. *Perrin v. United States*, 444 U.S. 37, 42 (1979). Here, the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield*, 569 F.3d at 953–54 & n.3 (quoting *Webster's Third New International Dictionary* (2002)).

The Supreme Court, every Circuit Court to address the issue, and this Court, disagree with RxLink's interpretation. *Campbell-Ewald*, 577 U.S. at 156 ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call'".)[2] Start with RxLink's initial proposition: the TCPA could not possibly apply to text messages because those didn't exist in 1991. That reading focuses mainly on the single use of the word the "call" in section 227(c)(5). (MTD at 10-11.) But reading section 227(c)(5)'s private right of action in context with the substantive Do Not Call

---

[1] RxLink also includes inflammatory, unproven, and irrelevant assertions about Mr. Newell's prior litigation history and his telephone numbers. But it admits, in Footnote 4, that these allegations are made "solely to provide relevant background and context." Notwithstanding the dubious nature of this characterization, these are factual issues the Court need not, and cannot, address at this stage. *See Pro Source*, 2025 WL 817485, at *4-*6.

[2] *See also Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, at n.2 (11th Cir. 2025) ("We use the terms 'robocalls' and 'robotexts' as shorthand for calls and texts made 'using any automatic telephone dialing system or an artificial or prerecorded voice'—*i.e.*, the calls and texts that the TCPA regulates….We note that even though the statute on its face does not mention text messages, the FCC—by regulation—has interpreted the word 'call' to include text messages."); *Drazen v. Pinto*, 74 F.4th 1336, 1346 (11th Cir. 2023) ("we hold that the receipt of an unwanted text message causes a concrete injury"); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023); *Breda v. Cellco Partnership*, 934 F.3d 1, 3 n.1 (1st Cir. 2019) ("The TCPA also applies to . . . text messages."); *Gadelhak v. AT&T Servs.*, 950 F.3d 458, 463 (7th Cir. 2020) ("We therefore agree with the Second and Ninth Circuits that unwanted text messages can constitute a concrete injury-in-fact."). "The Supreme Court ratified the FCC's interpretation that a text message was a call for the purposes of the TCPA in *Campbell-Ewald v. Gomez*." *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 198-99 (D. Mass. 2021).

List provisions of section 227(c) confirms that text messages are covered. RxLink's approach leaves telephone subscribers "at the mercy of advancing technology" and permits it to "erode the privacy guaranteed by the" TCPA merely because call technology has advanced. *Kyllo v. United States*, 533 U.S. 27, 28 (2001) (extending Fourth Amendment protections to new technology).

While it is true that courts cannot "modernize" the TCPA, MTD at 11, RxLink gets the analysis backwards: although courts cannot rewrite a statute to update it to account for modern technology, *Facebook, Inc. v. Duguid*, 592 U.S. 395, 397 (2021), Congress can nevertheless craft an open-ended statutory mandate that *accommodates* developments "in light of advances in technology," *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 (2025). That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding" concerning the same. 47 U.S.C. § 227(c)(1). RxLink advocates a reading that rewrites the statute to *shrink* the TCPA's privacy protections because technology has changed. There are limits to the "power of technology to shrink the realm of guaranteed privacy." *Kyllo*, 533 U.S. at 34. A Court looks to the plain meaning of the text, rather than the specific facts or technology that Congress may have had in mind[3] in 1991 at the time of the TCPA's passage. *Medvidi*, 2025 WL 2856295, at *2.

In context, the ordinary meaning of § 227(c)'s text here establishes that Congress articulated an intelligible principle untethered to subsequent technological developments by authorizing the FCC to protect *all* "residential telephone subscribers," including cell phone subscribers and paging subscribers, who receive text "messages." 47 U.S.C. § 227(c)(1). And

---

[3] The Supreme Court's recent decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), all but precludes the analysis conducted in *Jones* and *Davis*. *Bostock* makes clear that the plain text controls, even if the Congress that passed the law *never intended* the law to be used so broadly. *Id.* at 652. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 652-53.

that remains true even if text messages were not the "particular manifestation of a problem" that was front of mind when the TCPA was first enacted. *Nat'l Cable & Telecom. Ass'n v. FCC*, 567 F.3d 659, 665 (D.C. Cir. 2009). The TCPA's Do Not Call List provisions grant the FCC broad authority. 47 U.S.C. § 227(c)(1). As both the FCC and courts have long recognized, the ordinary meaning of the DNC provision authorizes the FCC to protect cell phone subscribers. *See, e.g.*, 18 FCC Rcd. 14014, 14037 ¶¶ 33–36; *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 203 n.4 (S.D.N.Y. 2024*)* (collecting cases). And the FCC has exercised that authority to provide *explicit statutory protection* in the TCPA's implementing regulations, and not mere interpretative guidance, MTD at 13, to subscribers who use cell phones to receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers").

All of those decisions accord with the plain meaning of the statute.

Start with what the statute prohibits: unwanted "telephone solicitations." 47 U.S.C. § 227(c)(3). "Telephone solicitation" is a defined term in the TCPA. *Id.* § 227(a)(4). In essence, it means "a telephone call or message" "which is transmitted to any person" for commercial purposes, subject to certain exceptions. *Id.* Text messages to cell phones fit that definition. First, to state the obvious, a cell phone is a "telephone." *See, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (using the phrase "cellular telephone"). The word "message" suggests that Congress had no particular technology in mind: "Message" means "[a]ny notice, word, or communication, *no matter the mode and no matter how sent*, from one person to another." Black's Law Dictionary, 6th Ed. (1991) (emphasis added). Even a "call" is a "request, demand, or command." Black's Law Dictionary, 12th Ed. (2024). And Congress's use of the word "transmitted" also conveys no preference for wires: "Transmit" means "to send a signal *by radio waves or by wire*." Transmit,

6

Webster's College Dictionary (1991) (emphasis added). So, a "telephone solicitation" can be received on any kind of telephone in any manner. Congress referred to "call or message" disjunctively to broadly capture many telephone technologies. *See, e.g.*, *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012). "[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy." *Skopos*, 2025 WL 2029274, at *4.

There is only one other reference to "calls" in § 227(c), and it has the same breadth as "telephone solicitations." In § 227(c)(1)(D), Congress directed the FCC to assess whether it needed additional statutory authority "to further restrict telephone solicitations, including those *calls* exempted under [former] subsection (a)(3) [defining "telephone solicitation"]." So § 227(c)(1)(D)'s reference to "calls exempted under" the definition of "telephone solicitation" presumably mirrored that definition of "call"—which, as explained above, broadly encompasses a "telephone call or message" and thus covers text messages even more clearly than the word "call" standing alone. 47 U.S.C. § 227(a)(4); *see supra*.[4] RxLink's contrary reading citing § 227(a)(4), MTD at 12, doesn't work. If Congress wanted to limit §227(c)(5) to voice calls, using the word in light of purportedly contradictory language defining a "telephone solicitation" would be a strange way to get about it. As a matter of statutory construction, a "call" includes a text.

    ii.    <u>The authorities RxLink cites are unpersuasive and commit construction errors.</u>

RxLink cites *Davis* and *Jones* for the proposition that the TCPA cannot apply to text messages. But those cases are unpersuasive because they rely on extratextual considerations. *Bostock*, 590 U.S. at 652-53. There, the respective courts held that a text message could not be a "call" for purposes of § 227(c)(5)'s private right of action because "[t]ext messaging was not an

---

[4] Because §227(c)(1)(D) confirms that the slight variation between the use of a "call or message" in §227(a)(4)'s capacious definition and the use of "call" in §227(c)(5) is immaterial, *Jones'* reliance on this distinction to adopt a restrictive interpretation of §227(c)(5) is unpersuasive.

available technology in 1991," and "in today's American parlance, 'telephone call' means something entirely different from 'text message.'" *Jones*, 2025 WL 2042764 at *4. In support of this proposition, Defendant cites another dictionary definition that says a "telephone" in 1991 was something used for the "transmission of sound or speech." (MTD at 11) (citing *Random House Webster's College Dictionary* (1st ed. 1991)). But that's a red herring. There's no question that a text is a "telephone" communication; of course it is. It's sent to a "telephone number," just like other transmissions that can violate the Do Not Call List rules. *See* 47 U.S.C. § 227(c)(3)(F). The relevant question is the meaning of the word "call," not the meaning of the word "telephone," and the definition of *that* term, analyzed *supra*, is equally clear.

Jones and its progeny[5] get statutory interpretation wrong in two important ways, as the Southern District of Florida has observed. *Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025) (citing multiple cases for the proposition that text messages constitute "calls" under the TCPA). *First*, as the Supreme Court has warned, "modern intuition" doesn't always match "evidence of a term's meaning at the time of [a statute]'s enactment." *New Prime*, 586 U.S. at 114. Statutes are not "confined to the particular applications contemplated by the legislators." *Diamond v. Chakrabarty*, 447 U.S. 303, 315–16 (1980); *Bostock*, 590 U.S. at 652-53. Like a 1991 law that bars "vehicles" from a park, *Jones* and *Davis* went astray by reflexively applying extratextual modern intuitions about how people today discuss text messages to language from 1991, before the first text message was ever sent. But the 1991 meaning of "call"—which "refers to both oral and written communications"—is what matters. *Medvidi*, 2025 WL 2856295, at *2; *see Lozano*, 702 F. Supp. 2d at 1007.

"In determining whether section 227(c) applies to text messages, the Court looks to the

---

[5] The same faulty reasoning is embraced nearly identically in both cases.

plain meaning of the text rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage." *Id.* Under that reasoning, the word "call" could not refer to a text message sent to a "paging service," which is explicitly protected. Similarly, § 227(b)(1)(A), an autodialer provision, uses the word "call" several times to describe a prohibited transmission to both a "cellular telephone" and "a paging service." It's incongruous to refuse to apply this definition to an evolved form of paging. *Jones* and *Davis* also rely on that same intuition, finding it impossible to read "call" in anything but the familiar colloquial sense, and so concluded that the "analysis begins and ends there." *Davis*, 2025 WL 2491195, at *1. No doubt most people wouldn't use "call" the way the TCPA does in casual conversation, especially nowadays, where we describe written messaging between phones as "texting."

But statutory interpretation does not turn on modern colloquial usage. To the contrary, when language has evolved since a statute's enactment, current usage can be misleading. For example, in *New Prime*, the Supreme Court explained that the statutory term "contracts of employment" in the Federal Arbitration Act nowadays might exclude independent contractors. 586 U.S. 105, 114 (2019). But that "modern intuition" did not match the "evidence of the term's meaning at the time of the Act's adoption," which revealed that "'contract of employment' usually meant nothing more than an agreement to perform work." *Id.* The Supreme Court therefore held that the statutory exception at issue reached not just conventional "employees," as modern parlance might suggest, but also modern independent contractors, as definitions from the time of the statute's enactment showed. *See id.* at 114–16. *New Prime* illustrates the proper statutory interpretation to apply when a mismatch arises between current intuitions and the original meaning at the time of enactment: the latter controls—not (as RxLink's cases put it) how an "ordinary person would think of a text message" today, *Davis*, 2025 WL 2491195, at *1, or

"today's American parlance," *Jones*, 2025 WL 2042764, at *4. As a result, because the text's statutory provision already covers text messages under a proper interpretation of the word "call," there is no need to "rewrite the [TCPA] to keep up with changing technology." (MTD at 11.)

*Second*, it's irrelevant that Congress didn't have text messages specifically in mind in 1991 when it extended protection to "calls." *See supra* (citing *Consumers' Rsch.*, 145 S. Ct. at 2505; *Oncale*, 523 U.S. at 79; *Nat'l Cable & Telecom. Ass'n*, 567 F.3d at 665). Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Id.* And in its mandate, Congress articulated a broad intelligible principle untethered to technological developments. RxLink says that in "ordinary usage," it sounds odd to refer to a text message as a telephone call. (MTD at 11.) But applying that same reasoning, it would be just as odd to use RxLink's restrictive interpretation in relation to written communication such as pages and faxes, which are covered. *See, e.g.*, 47 U.S.C. § 227(b)(1)(A)(iii) (pager "calls"); *id.* § 227(b)(1)(C) (fax); *id.* § 227(d) (fax "communications").

Especially in this context, where Congress knows that telecommunications technology tends to evolve with time, courts should not lightly assume that Congress drew arbitrary lines based on the specific technology used, particularly in a section dealing with "consumer protections," Section 227(c). *Esquivel*, 2025 WL 3275607, at *3. It is the meaning of those terms that governs, not the specific facts or technology that Congress would have had in mind in 1991. As explained, the statute *does* explicitly cover any "telephone solicitation," which is expressly defined to include any "call or message." 47 U.S.C. § 227(a)(4). "The fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pa. DOC v. Yeskey*, 524 U.S. 206, 212, (1998).

RxLink also argues that reading "call" to include text messages risks subjecting other

smartphone capabilities—such as "emails" and "app alerts"—to the TCPA. (MTD at 11.) But that argument just confirms that RxLink's interpretation of "call" ignores its context. A Do Not Call List violation occurs only when a prohibited "telephone solicitation" is directed to a listed "telephone number." 47 U.S.C. § 227(c)(3)(F). An e-mail address is not a "telephone number," so merely receiving an e-mail on a phone doesn't make it a TCPA violation. The same goes for app alerts, which are delivered through an app, not a phone number. [6]

### iii.    Post *Loper Bright*, the FCC got it right.

*Jones* also disregarded the FCC's longstanding interpretation of "call" to include text messages because the FCC, until 2023, had only articulated that interpretation in the context of the statute's autodialer prohibitions. 2025 WL 2042764, at *4–5. But that's unsurprising. The Do Not Call List provisions are built around the defined term "telephone solicitation," which includes a "telephone call or message." The standalone word "call" is much more extensively used in § 227(b)'s autodialer and robocall prohibitions, or in associated definitional provisions.[7] The FCC has recognized since 2003 that when the statute says "call," it means not just voice calls but also text messages. 18 F.C.C. Rcd. at 14115 ¶ 165 (defining telemarketing calls to "encompass[] both voice calls and text calls to wireless numbers"). It later exercised its Congressionally-authorized authority to provide *explicit statutory protection* in the TCPA's implementing regulations, and not mere interpretative guidance, to subscribers who use their wireless telephone numbers to receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing

---

[6] This argument also fails because app notifications and emails can be delivered to devices that don't even have telephone numbers at all, such as tablets and computers.

[7] *See* Telephone Consumer Protection Act of 1991, Pub. L. 102–243, 105 Stat. 2394, § 3(a) (using "call" or "calls" in the original text of 47 U.S.C. §§ 227(a)(1), 227(a)(3), 227(b)(1)(A), 227(b)(1)(B), 227(b)(2)(A), 227(b)(2)(B), 227(c)(1)(D), 227(c)(5), 227(d)(1)(A), 227(d)(3)).

calls or text messages to wireless telephone numbers"). As an appropriately promulgated administrative regulation authorized by Congress, that statutory pronouncement has the force and effect of law, even after *Loper Bright*. *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979).

Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Even after *Loper Bright* and *McLaughlin*, agencies can still receive deference for their reasonable interpretations in appropriate cases, and neither case affects explicit agency rulemaking, so long as Congress articulated an intelligible principle and the agency promulgates law consistent with Congress' articulated intent. *Id*. at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1), and which resulted in the regulation.

Even if the statute left room to doubt that a text message can be an actionable violation of the Do Not Call List provisions (which it doesn't), the FCC's longstanding interpretations of the words "call" and "message" should still carry the day. The FCC is regulating here with authority expressly delegated by Congress. 47 U.S.C. § 227(c)(1)(A) (tasking the FCC with evaluating approaches); 47 U.S.C. § 227(c)(1)(E) (permitting the FCC to make rules). That broad language grants discretionary authority to "fill up the details," accompanied by "flexibility" to determine what rules will best effectuate the TCPA's goals. *Loper Bright*, 603 U.S. at 395. For example Congress in 1993 directed the FCC to decide if cell phone companies are "common carriers" whose subscribers have TCPA rights, and again in 1996 to address whether new services, like text messages, provided by them were "exchange services." *Compare* 47 U.S.C. § 332(a)(1)(A),

12

47 U.S.C. § 153(53), (54) *with* 47 U.S.C. § 227(c)(3). That expressly delegates to the FCC "authority to give meaning to a particular statutory term." *Loper Bright*, 603 U.S. at 395.

Acting under that express delegation, the FCC reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. Even after *Loper Bright* and *McLaughlin*, Congress can still permit an agency to create a definition when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395. Because the FCC acted reasonably and consistently in reaching that conclusion, this Court should affirm that "reasoned decisionmaking." *Id.* at 395.

Finally, Defendant says a separate provision, added in 2018, distinguishes between calls and text messages. (MTD at 12) (citing the Consolidated Appropriations Act). But, if anything, § 227(e)(8) shows the opposite: It reinforces that texts are calls, and it limits the definitions to the "purposes of this subsection," confining its definitions to subsection (e). This is "contrary evidence" that any incongruous reading only applies to this subsection. *Henson*, 582 U.S. at 85. But not even this subsection is incongrouous. It describes a "text message" as coming from a "caller," just like a voice call. The takeaway is that, by identifying two types of calls, both of which come from a "caller," both types require "caller identification." That reading accords with the meaning of "call" used elsewhere in the TCPA. But even if it distinguished between texts and calls, the statute explicitly provides that it will not modify any other FCC orders, which included

13

the FCC's prior rulemaking and interpretations outlined here.

At minimum, this court should look to the FCC's longstanding and consistent interpretation of the words "call" and "message" as an "informed judgment to which [it can] properly resort for guidance." *Id.* at 388. Not only that, but Congress has ratified this decisionmaking. Recognizing this, even after *Jones* and *Davis*, courts have continued to defer to the FCC's well-reasoned decision to prohibit text messages to cell phones on the DNC, even after *Loper Bright* and *McLaughlin*, particularly in light of the *statutory* rulemaking hook contained in 47 C.F.R. § 64.1200(e). This court should do the same.

B.     *The calls Plaintiff received were "telephone solicitations" because they encouraged him to use Defendant's prescription discount card service.*

Defendant claims that the calls that the Plaintiff received were not telephone solicitations because they did not encourage him to "purchase or invest in" any "property, goods, or services." 47 U.S.C. § 227(a)(4). That's false. The calls encouraged Plaintiff to invest in RxLink's *prescription discount card services* by providing *specific card information* to a pharmacy. Defendant is deliberately cagey about its business model, because if it were forthright with the Court about how its program worked, this Court should have no trouble concluding that it encouraged the Plaintiff to "invest in" the Defendant's prescription discount card services.

Defendant's statement that it does not "sell or advertise products or services to consumers," MTD at 7, is too clever by half and deliberately misleads the Court. In essence, Defendant operates a prescription savings card scheme. *See generally United HealthCare Ins. Co. v. AdvancePCS*, No. CIV.01-2320(RHK/JMM), 2002 WL 432068, at *3 (D. Minn. Mar. 18, 2002) (discussing how pharmacies use each of the numbers in the calls, including BIN, to send patient prescription data to the card issuer). Such schemes make money for RxLink in two ways, and only work *if the customer provides the card number*, i.e. the *product*, to their pharmacy.

14

First, pharmacies pay kickbacks to the savings card company in exchange for the services they provide in "steering" customers to the pharmacy. *Water Tree Ventures LLC v. Giles*, No. 3:18-CV-1421-MCR-HTC, 2019 WL 13161889, at *1 (N.D. Fla. July 12, 2019). Second, because they are not HIPAA covered entities, companies like RxLink make more money by selling patients' information to advertisers and drug companies. *See AdvancePCS*, 2002 WL 432068, at *3-*4; *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 267 (2d Cir. 2010). For RxLink, the statement that it does not advertise its "products or services" to customers, may be true, *technically*, but that's only because, for RxLink, the patient *is* the product.[8] Even that's questionable, as its card *is* advertised to recipients, who must use it, and give up health information, to get the discount.

Viewed through this lens, it is clear that the calls were sent to advertise the availability, and encourage the call recipient, to *use* RxLink's prescription discount card service to *pay for prescriptions*, which, if used, would result in payment and provision of patient data to RxLink. It is in this respect that *Hulce v. Zipongo Inc.* actually helps Plaintiff. Here, the calls Plaintiff received "persuade" and "urge" the call recipient, MTD at 19, to pay for their prescriptions *using the RxLink discount card*. *Hulce*, 132 F.4th 493, 498 (7th Cir. 2025). This is no different than Amex[9] advertising new cardholders triple points at a pharmacy. Thus, they urged call recipients to make a specific purchasing decision: to buy using *its card*. But a consumer doesn't *have to* use the RxLink card. They can use their health insurance to pay, and protect their privacy, but give up the discount. Or they could use another company's discount card that offers them a better

---

[8] The terms linked on the calls admit as much. *Terms of Service*, RxLɪɴᴋ, https://rxlink.com/terms/ (explaining that card use will be reported "back to [RxLink]" and used "to provide you with targeted coupons and discounts on prescriptions," and will further result in "referrals to third parties that can provide assistance with affordability of prescription drugs.").

[9] This is where the wheels fall off Defendant's "purchase" theory. A credit card company makes zero money unless the card is actually used at a merchant, in which case it gets paid a percentage of the purchase price and nothing from the customer, assuming the balance is paid in full.

deal. RxLink is not the only provider of prescription discount cards. Many other companies offer such cards. And our capitalist free market system allows consumers to pick which combinations of terms and benefits best suit their needs. In *Hulce*, the calls advertised the availability of free services that plaintiff *already* had available to him as part of his insurance. *Id.* at 500. By contrast, the calls here encouraged recipients to invest in a commercial service, a prescription discount card, that gives a call recipient a discount on their prescriptions *if they choose to use it and agree to its terms*, among a *choice* of many such cards on the market (or none at all).

It is for this reason that at least two courts have held that faxes advertising nearly identical schemes *were* unsolicited advertisements under the TCPA's fax regulations since they advertised how to get specific prescription drugs at a discount, *precisely* as the calls at issue here. *Michigan Urgent Care & Primary Care Physicians, P.C. v. Med. Sec. Card Co.*, LLC, No. 2:20-CV-10353-TGB, 2020 WL 7042945, at *2-*3 (E.D. Mich. Nov. 30, 2020); *Mills Cashway Pharmacy, Inc. v. Change Healthcare Inc.*, No. 3:24-CV-00978, 2025 WL 1085816, at *3 (M.D. Tenn. Apr. 10, 2025). None of the other authorities Defendant cites help it because they are distinguishable. Unlike in *Aderhold*, *Daniel*, *Gragg*, or *Wick*, the call recipient here is *not* being asked to complete the purchase of something they had already expressed interest in (and thus arguably consented to). In *every single one* of those cases, the messages weren't solicitations because they were simply sent because the plaintiffs had *asked for them* or they were informational messages sent in the completion of a transaction. That is plainly not the case here.

Though the definition of a "telephone solicitation" requires the "purchase" or "investment" in "property, goods or services," courts across the country have held that messages encouraging call recipients to use even free services can qualify, so long as they encourage the called party to *contract with the Defendant*, in a manner that results in a third party making a

payment to the Defendant, which is *precisely* what the calls encouraged Plaintiff to do. *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 133 (3d Cir. 2019) (recognizing "third party" purchase liability under the TCPA); *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (call encouraging redemption of free reward points at a store was telemarketing); *Cacho*, 739 F. Supp. 3d at 209. ("[T]he challenged calls allegedly sought to encourage *Plaintiff* to contract with Defendant and to direct a portion of a future right to payment to Defendant. While those funds would originate from a third party, the calls urged the relevant decisionmaker-namely, Plaintiff-to allocate those funds."); *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 283 (S.D.N.Y. 2013) ("the fact that the recipient of the fax is not the one paying for the product does not make the proposed transaction non-commercial"); *Rockwell v. Medicus Healthcare Sols., LLC*, No. 24-CV-128-LJV, 2025 WL 959745, at *4 (W.D.N.Y. Mar. 31, 2025) ("[S]ervices that appear to be free or to offer recruitment opportunities may 'serve as a mere pretext for commercial services.'") (quoting *Suescum v. Fam. First Life, LLC*, No. 6:21-CV-1769-WWB-EJK, 2023 WL 311144, at *2 (M.D. Fla. Jan. 19, 2023) (quoting *Neurocare Inst. of Cent. Fla., P.A. v. Healthtap, Inc.*, 8 F. Supp. 3d 1362, 1367 (M.D. Fla. 2014) (quoting *In re Rules*, 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)))).

The statutory text informs this reasoning: "investment" doesn't necessarily involve a monetary outlay; instead, one can "invest" in a service by "mak[ing] use of [it] for future benefits or advantages." Webster's 9th Collegiate Dictionary (1990). As *Suescum* explains, "Plaintiffs allege that Defendant's text messages prompted them to view a website encouraging them to purchase warm leads. As a result, the instant case is distinguishable from the cases cited by Defendant because Plaintiff has sufficiently alleged that Defendant's *unsolicited texts served as a pretext to commercial activity*—the sale of leads to insurance agents—as opposed to an

offer to hire." *Suescum*, 2023 WL 311144, at *3. So too here. If the call recipient uses the card, RxLink gets the recipient's prescription data and a kickback payment from the pharmacy, and the recipient gets a discount. If the recipient uses a different card, the other company gets the same (usually differing in amount). And if the recipient uses no card, nobody gets anything. This is no different than the rewards scheme the Ninth Circuit held was solicited in *Chesbro*, 705 F.3d at 918, or a credit card offer. There is no other use for Defendant's card than to buy drugs. *Id.*

Just as in *Cacho*, which held that a contingent attorney representation was a "solicitation," the calls here were "solicitations" because they "do not improperly separate the 'encouragement element from the purchasing element.'" 739 F. Supp. 3d at 209 (quoting *Hulce*). A plaintiff with a case has many attorneys willing to take on his case for a contingent fee, just as he has a choice when it comes to credit cards. In each scenario, the plaintiff assigns third-party payment to a *particular* entity from a universe of possible attorneys who could all be paid, all on different terms. So too here. The calls encouraged plaintiff to use a *particular* savings card, which would result in the Plaintiff choosing to assign a right of payment and collection of purchase information from the pharmacy *to RxLink* on specific terms, as opposed to insurance or a multitude of other prescription drug savings card companies. As explained in *Michigan Urgent*:

> Defendant is alleged to be a for-profit limited liability corporation, and according to its website there is something being bought and sold here: access to negotiated rates on discount drugs, and access to more consumers and their overall purchasing power. . . . The buying and selling is facilitated through patients' use of the discount card program; by extension, it is also facilitated by a doctor's choice to provide a patient with information about these cards. This is the key difference between the fax in *Sandusky* and Defendant's fax: the promotion in *Sandusky* was not trying to "attract clients or customers," but here, it is. . . . Defendant's fax is trying to cause doctors to recommend a service to their patients (even if that service comes at no cost to the doctors or the patients) which, if the patients use it, will financially benefit Defendant. This service, unlike in *Sandusky*, is not one that patients have already signed up for through their health insurance provider. MSCC's discount card program is something that patients would have to actively make the choice to use. . . . To be sure, this is an unusual form of advertisement. Generally, the customers who pay for a product are the same people as the users of the product, and so advertisements are directed toward them and promote the

products "to be bought and sold." But not every business model is so straightforward. The Sixth Circuit acknowledged in *Sandusky* that sometimes advertising occurs "indirectly." Other district courts have found faxes to be advertisements even when they promote something that another entity, not the recipient of the fax, will pay for.

2020 WL 7042945, at *3 (cleaned up). Because the plaintiff has pled that the calls encouraged

Plaintiff to invest in RxLink's discount card service, the calls were "telephone solicitations"

under the TCPA. To the extent that evidentiary issues remain, they're inappropriate here.

C.      *No exemption applies to these solicitation calls.*

RxLink's argument that its telephone solicitation calls are exempt emergency or

healthcare calls under the TCPA borders on the frivolous. As an initial matter, the TCPA's

emergency purposes exemption *only applies* to *robocalls*, which are covered under Section

227(*b*), *not* telemarketing calls to numbers on the National Do Not Call Registry, which are

covered under Section 227(*c*). 47 C.F.R. § 64.1200(a)(1) (discussing calls made "using an

automatic telephone dialing system or an artificial or prerecorded voice"); 47 C.F.R. §

64.1200(a)(3) (same). Thus, the claimed exception, by its very statutory text, does not apply to

the conduct at issue here, as the Plaintiff does not allege receipt of a robocall. Defendant *itself*

notes that this exception only applies in 47 U.S.C. § 227(*b*)(1)(A). (MTD at 21.) Defendant

cannot transplant an exception that belongs to one subsection of the statute to apply to another

subsection. *Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *7-*8 (E.D.

Pa. July 15, 2021) (holding that 227(b)(1)(b) exemption did not apply to 227(b)(1)(a) claim).

But even if the emergency exemption applied, the calls were plainly not emergency calls.

The calls at issue are not prescription reminder calls but instead commercial calls to encourage

recipients to use RxLink's savings card services. As the DC Circuit has noted, not every

healthcare-related call satisfies the "emergency purposes" exception. *ACA Int'l v. FCC*, 885 F.3d

687, 714 (D.C. Cir. 2018). "It would be implausible to conclude that calls concerning

19

'telemarking, solicitation, or advertising content,' . . . are made for 'emergency purposes.'" *Id.* The calls here advertise the availability of a discount card that *can* be used to purchase drugs, but that need not be, and that, if used, will create a contractual relationship and result in the provision of a payment and patient data to RxLink. Determining whether a healthcare call is made for "emergency purposes" is conducted on a "case-by-case basis" to determine if it is truly "necessary" to promote "health and safety." *Smith v. Rite Aid Corp.*, No. 17-CV-6044 CJS, 2018 WL 5828693, at *4, *5 n.4 (W.D.N.Y. Nov. 7, 2018). Saving money on drugs by using an optional card is unquestionably not "necessary" to health or safety; rather, it "stimulates demand" for a product in a way that a prescription reminder does not. *See Michigan Urgent*, 2020 WL 7042945, at *3 (noting that the card is unnecessary and a commercial product).

Defendant's argument also fails because it doesn't even qualify as an entity that can avail itself of this exemption, even if it did apply. The healthcare emergency purposes exemption to the TCPA only applies to a "'covered entity' or its 'business associate,' as those terms are defined in the HIPAA Privacy Rule" 47 C.F.R. § 64.1200(a)(3)(v). RxLink admits it's not a "covered entity." (MTD at 9 n.5.) It's not a "business associate" of a covered entity, either. Under HIPAA, a "business associate" is generally one who provides services on behalf of a covered entity. 45 CFR § 160.103. RxLink identifies *no* covered entity that has hired it with which it is "associating". To the extent that Defendant disputes this, all this goes to show that this is an evidentiary issue that simply can't be fleshed out on a motion to dismiss. Like the issue of the calls' purpose, the motion to dismiss on this basis is due to be denied, as well.

## V.    CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, it should permit the Plaintiff to amend to correct any deficiencies.

20

Dated: November 28, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

November 28, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.

21