**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

JOUREY NEWELL, *individually and on behalf of a class of all persons and entities similarly situated*,

          Plaintiff,

   v.

RXLINK INC.,

          Defendant.

CASE NO. 2:25-cv-4270-MRP

**REPLY IN SUPPORT OF RXLINK INC.'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................................1

II. ARGUMENT .......................................................................................................................2

    A. The Statutory Text and Structure Control, and
They Limit § 227(c)(5) to "Telephone Call[s]" .......................................................2

    B. The FCC's Post-2024 Regulation Cannot
Expand § 227(C)(5)'s Private Action ......................................................................6

    C. Mr. Newell Still Fails to Allege a "Telephone Solicitation" ...................................7

        i. The Complaint and Texts Themselves Describe
Informational Prescription Notifications, Not Sales Pitches. .....................7

        ii. Plaintiff's "Prescription Discount Card Scheme" Theory is
Speculative and Conflicts with His Own Factual Allegations. ...................9

    D. The Healthcare and Emergency-Purpose Framework
Confirms These Texts Are Informational, Not Solicitations ................................11

III. CONCLUSION ..................................................................................................................14

## I.    INTRODUCTION

Mr. Newell's belated Opposition[1] attempts improperly to replead his case as a typical telemarketing dispute. It is not. Mr. Newell asserts a single claim under § 227(c)'s DNC provisions based on text messages that: (1) were automatically triggered by a physician's prescription, (2) notified the consenting prior owner of the New Number that the prescription had been written and how he could reduce his out-of-pocket cost, and (3) included no request for payment, enrollment, purchase, or engagement with any RxLink product or service. The Opposition does not meaningfully confront this reality. Instead, it rests on three flawed premises—each legally insufficient.

***First***, § 227(c)(5) does not create a private right of action for text messages. Congress authorized suit only for more than one "telephone call" in 12 months. 47 U.S.C. § 227(c)(5). The Opposition's attempt to treat any text message as a "call" rewrites the statute, disregards Congress's decision to use narrower language in § 227(c)(5) than in other TCPA subsections, and ignores Congress's separate treatment of "text messages" elsewhere in the Act. The Opposition's reliance on cases interpreting **§ 227(b)** cannot change the statutory text that governs here.

***Second***, the messages are not "telephone solicitations" as a matter of law. A "telephone solicitation" is a communication that encourages the recipient to purchase a good or service. Nothing in the Complaint—or in the content of the texts—suggests that RxLink sought to sell Mr. Newell anything. The Opposition's sweeping, false narrative about a supposed "prescription card scheme" is nowhere to be found in the pleadings. Mr. Newell cannot manufacture a solicitation by speculating about RxLink's business model or borrowing allegations from unrelated lawsuits about actual sales calls. Mr. Newell's own assertion that he did not initiate the RxLink messages further

---

[1] Mr. Newell's Opposition (ECF No. 23) was filed four days after the Court's November 24, 2025 deadline. See ECF No. 21; ECF No. 23.

undercuts any claim of inducement. If he did not initiate the interaction, he could not have filled the prescription, and the messages could not have enticed him into any transaction.

***Third***, the healthcare exception and the emergency-purpose framework confirm that the challenged texts are informational, not telemarketing. The FCC and numerous courts have repeatedly distinguished prescription-related notifications from advertising because such messages facilitate patient access to clinician-directed treatment. The Opposition's effort to treat helpful cost-*saving* information as "demand-stimulating marketing" misstates the governing guidance and contradicts decisions categorizing notifications connected to a prescription as messages conveying health-and safety-related information—not solicitations.

Because Mr. Newell cannot establish that § 227(c)(5) applies to text messages and cannot plausibly allege a "telephone solicitation," the Court should dismiss the Complaint with prejudice.

## II.   ARGUMENT

### A.   The Statutory Text and Structure Control, and They Limit § 227(c)(5) to "Telephone Call[s]"

Section 227(c)(5) creates a private cause of action only for "more than one ***telephone call*** within any 12-month period" made in violation of the FCC's DNC regulations. 47 U.S.C. § 227(c)(5) (emphasis added); *see* Br. at 5–7. Congress could have used broader language—like "call or message," or "any communication," or even the expansive "any call" phrasing it employed in neighboring subsections. *See, e.g.*, 47 U.S.C. § 227(a)(4) (defining "telephone solicitation" as "the initiation of a ***telephone call or message***" (emphasis added)). But it did not. Courts must "presume differences in language . . . convey differences in meaning." *Tepper v. Amos Fin., LLC*, 898 F.3d 364, 370 (3d Cir. 2018) (alteration in original) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)). The Court cannot insert words Congress omitted.

2

Mr. Newell offers no textual basis for rewriting "telephone call" to mean "telephone call or text message," because he cannot. He instead relies on authorities interpreting the different phrase "any call" in § 227(b)(1)(A), a subsection that uses broader language and regulates different conduct. *See* Opp. at 2 (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 153 (2016) and *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009)). Those decisions did not address, much less interpret, the phrase "telephone call" in § 227(c)(5). *Campbell-Ewald* observed that the parties did not dispute that a text constitutes a "call" for purposes of § 227(b)(1)(A)(iii). 577 U.S. at 153. *Satterfield* addressed that same provision, noted that the statute is silent on whether a text message is a "call," and rested its conclusion on *Chevron* deference—an approach the Supreme Court has since overruled. 569 F.3d at 954.

The Opposition's post-*McLaughlin* authorities fare no better. Mr. Newell points to one of his other cases for the proposition that the TCPA applies to "text calls." Opp. at 2 (citing *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 582 (E.D. Pa. 2025)). But this again misses the point. *JR Capital* held that the FCC's regulation 47 C.F.R. § 64.1601(e) applies to text messages; it did not interpret § 227(c)(5), let alone hold that the statutory phrase "telephone call" encompasses text messages for purposes of the DNC private cause of action. The remaining cases analyze § 227(b)(1)(A)'s broader "any call" language, not the narrower phrase "telephone call" in § 227(c)(5). *See* Opp. at 2 (citing *Perrong v. Chase Data Corp.*, 2024 WL 329933, at *2 (E.D. Pa. Jan. 26, 2024); *Shelton v. Pro Source Lending Grp. LLC*, 2025 WL 817485, at *4 n.4 (E.D. Pa. Mar. 14, 2025); *Mujahid v. Newity, LLC*, 2025 WL 3140725, at *2–3 (N.D. Ill. 2025); *Wilson v. Medvidi*, 2025 WL 2856295, at *2–4 (N.D. Cal. 2025); *Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4–5 (D. Or. 2025); *Esquivel v. Mona Lee, Inc.*, 2025 WL 3275607, at *2 (S.D. Cal. Nov. 24, 2025)).

3

For precisely this reason, the most recent district court decision addressing this issue (in California) declined to extend *Satterfield* to a § 227(c) claim and instead certified the question for immediate interlocutory review. In *Dilanyan v. Hugo Boss Fashions, Inc.*, the court recognized that *Satterfield* arose in a different statutory context, rested on now-abandoned *Chevron* deference, and presented a substantial ground for disagreement when applied to § 227(c)(5). 2025 WL 3549868, at *2–4 (C.D. Cal. Dec. 3, 2025). This Court, of course, is not bound by Ninth Circuit precedent construing a different provision under a different interpretive regime.

Rather, this Court is bound by *Loper Bright* and *McLaughlin*, which hold that courts must apply a contemporaneous ordinary-meaning methodology independently, without deferring to later agency assumptions. In 1991, there was only one ordinary meaning of "telephone call": a voice communication made over a telephone network. Contemporaneous dictionaries defined "telephone" as the transmission of sound or speech, and a "telephone call" as the act of speaking with another person via telephone. Br. at 6 (citing *Random House Webster's College Dictionary* (1st ed. 1991)).[2] As even Mr. Newell must concede, "text messaging didn't exist yet when the TCPA was passed in 1991, so Congress didn't have SMS messages specifically in mind." Opp. at 2. Congress, therefore, could not have silently incorporated a technology that did not yet exist into the phrase "telephone call" (though it could have done so with broader wording it chose not to use, like "any communication capable of being sent by a phone").

Mr. Newell does not dispute this historical usage. Nor does he offer any contemporaneous dictionary, industry standard, or linguistic source from 1991 defining "telephone call" to include written communications. He instead cautions the Court against relying on "modern intuition,"

---

[2] *See also* "[T]elephone," Oxford English Dictionary 1484 (2d ed.) ("[A]n apparatus for transmitting sound (esp. speech) to a distance by wire or cord or radio[.]"), https://archive.org/details/oxfordencycloped0000unse_h0i4/page/1484/mode/2up.

4

while citing a 2002 Webster's definition of "call" and a 2024 edition of Black's Law Dictionary to support his preferred interpretation of § 227(c)(5). *See* Opp. at 2, 4 (quoting *Satterfield*, 569 F.3d at 953–54 n.3 (quoting *Webster's Third New International Dictionary* (2002)); *see also id.* at 6 (quoting Black's Law Dictionary, 12th Ed. (2024)). He further argues that Congress's use of the term "telephone call" in 1991 should be construed broadly to accommodate technologies that developed later, analogizing to the term "vehicle" and today's electric cars. *See* Opp. at 1–2.

His analogy strains credulity. Congress did not adopt an open-ended umbrella term like "communication" for the DNC private action—the corollary to "vehicle." It chose the far narrower phrase "telephone call," while elsewhere using broader formulations—like "call or message" in § 227(a)(4)—and later enacting an explicit definition of "text message" in § 227(e)(8). When Congress intends to sweep broadly, it says so; when it intends to distinguish among modes of communication, it does that. Courts must give effect to those textual choices.

That Congress knows how to expand the TCPA when it wishes only underscores what it has not done here. If Congress intended § 227(c)(5)'s private right of action to reach text messages, it could have amended that subsection when it added § 227(e) or at any point in the last thirty years. It did not. Mr. Newell's invocation of *Henson* (at 13) to suggest otherwise is misplaced. Subsection (e) does not create the "contrary evidence" he suggests; it addresses a different subject—caller-ID spoofing—and uses language appropriate to that context. As *Henson* explains, when Congress employs different terms in different provisions, courts presume those differences reflect distinct meanings, not inadvertent inconsistencies. 582 U.S. at 86.

That presumption is confirmed by subsection (e)'s own structure. It expressly limits its definitions to "the purposes of this subsection," reinforcing that Congress did not intend to alter or broaden § 227(c)(5)'s longstanding trigger of "more than one telephone call." Nor does subsection

5

(e) "ratify" any FCC view extending DNC rules to texts. *See* Opp. at 13. Ratification requires Congress to reenact or amend the specific provision with knowledge of, and intent to adopt, the agency's interpretation. 582 U.S. at 89–90 (advising that "the proper role of the judiciary . . . [is] to apply, not amend, the work of the People's representatives"). Congress did nothing of the sort. Subsection (e) does not mention § 227(c), "telephone calls," the DNC rules, or private rights of action. Courts do not infer ratification from silence, particularly when the amendment appears in a different subsection, employs different terminology, and limits its definitions to that subsection alone. For these reasons, § 227(e) cannot be used to rewrite § 227(c)(5), and *Henson* forecloses Mr. Newell's attempt to erase the textual line Congress drew in (c)(5)'s private action.

### B.   The FCC's Post-2024 Regulation Cannot Expand § 227(C)(5)'s Private Action

Unable to locate statutory text supporting his position, Plaintiff turns to an FCC regulation (47 C.F.R. § 64.1200(e)) suggesting that Do-Not-Call rules apply to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers." Opp. at 6, 14. But nothing in that regulation purports to interpret the phrase "telephone call" in § 227(c)(5), and nothing in it suggests Congress authorized private plaintiffs to sue over text messages. Section 64.1200(e) implements the FCC's regulatory authority under § 227(c)(1) – (4) to adopt "methods and procedures" for telemarketers, not to expand who may sue or over what conduct in (c)(5). The distinction is critical. The agency's regulatory instructions about appropriate procedures for telemarketers cannot amend the scope of Congress's private cause of action, which is significantly narrower than the FCC's enforcement and regulatory powers. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001) ("private rights of action to enforce federal law must be created by Congress.

6

… a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.").[3]

Even if the FCC's interpretation retained some persuasive value despite not even addressing the statutory term at issue in this case (and it does not), it cannot override the statute's text. *McLaughlin* and *Loper Bright* make clear that courts must "independently determine" the meaning of the TCPA, and that agency views are—at most—nonbinding suggestions. *See* Br. at 8 (citing 606 U.S. at 155, 168–69; 603 U.S. at 388–89). The required reading of § 227(c)(5) is the one that honors Congress's deliberate choice to use the narrower phrase "telephone call" for the DNC private action, as opposed to the broader language used elsewhere in the TCPA or by the many other states that have amended their corollary statutes to address texts. The Opposition ignores this, attempting to sweep written communications that anyone alive in 1991 (or now) knows are not "telephone calls" under § 227(c)(5). That is statutory revision, not construction.

### C. Mr. Newell Still Fails to Allege a "Telephone Solicitation"

Plaintiff's claim also fails because his Complaint does not plausibly allege that the texts "encourage the purchase, rental, or investment in property, goods, or services," and thus that they are "telephone solicitations." Br. at 11 (citing 47 U.S.C. § 227(a)(4)).

    *i.*    *The Complaint and Texts Themselves Describe Informational Prescription Notifications, Not Sales Pitches.*

The texts Mr. Newell complains of state "Dr. Shum wrote you a prescription," identify the pharmacy where it can be filled, and provide optional information about potential cost *savings*. *See* Br. at 13 (quoting Compl. ¶ 22). They contain no promotional language, no incentives, no

---

[3] As a parallel example, the FTC's Telemarketing Sales Rule—analogous to the TCPA—regulates telemarketing broadly but authorizes private suits only for a narrow class of violations causing "actual damages of $50,000 or more." 15 U.S.C. § 6104(a). Regulators may police a wide range of conduct, while private enforcement is reserved for substantial injuries only.

7

exhortations to purchase anything from RxLink, and no reference to anything RxLink sells. And the Complaint itself states RxLink is a healthcare platform that "connect[s]" patients to pharmacies—not a seller of pharmaceuticals or any other services for purchase by consumers. Compl. ¶ 16. No amount of re-labeling can transform these prescription notifications into sales pitches.

Perhaps that is why the Opposition sidesteps one of the central flaws in the Complaint— unless *he himself* sought the prescription referenced in the texts, he could not have filled it, meaning the messages could not have induced him to engage in any commercial transaction. That undisputed fact forecloses his theory that the texts were sent to encourage him to "purchase" something, as they must be to state a claim. *Hulce v. Zipongo*, 132 F.4th 493, 498 (7th Cir. 2025) (confirming communications must induce the "recipient" to purchase, not some other party).

But the Opposition confirms Mr. Newell's claims fail regardless of that concession. All Mr. Newell's Complaint offers is the conclusory assertion that the texts "solicit new clients for Defendant's healthcare services." Compl. ¶ 24. That allegation is not only a bare legal conclusion— it is contradicted by the texts themselves. The texts are clear on their face: they provide notice that a preexisting prescription for a specific patient has been filled and how that patient can save money at the pharmacy where the physician called in the script. *See id.* ¶ 22. The Complaint never identifies what "services" RxLink supposedly sells consumers or how the texts encouraged Plaintiff to "purchase" any such service. Such threadbare recitals of statutory elements cannot survive a motion to dismiss. *See* Br. at 5 (citing *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Boring v. Google*, 362 F. App'x 273, 278 (3d Cir. 2010) ("[C]onclusory allegations of liability will not suffice.")). For this reason alone, Plaintiff's

Complaint fails to state a claim and, because its defects stem from arguments belied by the messages themselves, any amendment would be futile.

> ii. Plaintiff's "Prescription Discount Card Scheme" Theory is Speculative and Conflicts with His Own Factual Allegations.

Unable to identify any sales language in the text messages themselves or allegations in his own Complaint that support his arguments, Mr. Newell pivots in his Opposition to a new narrative: that RxLink supposedly operates a "prescription savings card scheme" funded by pharmacy kickbacks and data sales. Opp. at 14–18. None of this appears in the Complaint—and for good reason: it is not true. The pleading alleges no kickbacks, no sale of patient data, no discount card, and no RxLink service that anyone can purchase. Rather, the Complaint describes RxLink in neutral terms as a "healthcare technology platform that aims to connect patients to pharmacies." Compl. ¶ 16. Plaintiff's newly invented business-model theories—divorced entirely from his pleaded facts—are precisely the type of post-hoc amendment courts disregard at the Rule 12 stage. *Knopick v. UBS Fin. Servs., Inc.*, 121 F. Supp. 3d 444, 461 (E.D. Pa. 2015) ("[I]t is improper to use an opposition to a motion to dismiss to amend a complaint.") (citing *Pa. ex rel. Zimmerman v. PepsiCo*, 836 F.2d 173, 181 (3d Cir. 1988)). A plaintiff cannot salvage a deficient complaint by importing case-driven narratives from unrelated discount-card cases.

Mr. Newell's cited authorities only underscore the gap in his allegations. For example, the Opposition compares the texts RxLink sent to the automated telephone calls at issue in *Chesbro v. Best Buy Stores*. Opp. at 17 (citing 705 F.3d 913, 917 (9th Cir. 2012)). But that case involved automated calls by Best Buy to urge the recipient to engage in future commercial transactions with Best Buy. *Id.* at 916. And *Cacho*, *Bais*, and *Suescum* all involved communications that directly promoted paid services or linked to websites selling commercial products. *See* Opp. at 17 (citing *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 209 (S.D.N.Y. 2024) (offering contingent-

9

fee legal services); *Suescum v. Fam. First Life, LLC*, 2023 WL 311144, at *2 (M.D. Fla. Jan. 19, 2023) (promoting lead-sales websites); *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 283 (S.D.N.Y. 2013) (inviting recipient to sign up for sender's commercial news program)). By contrast, this case involves helpful, informational texts triggered by a physician writing a prescription via their digital health platform as a free benefit for the patient. Those texts tell patients their prescription is ready and how they can save money when they pick it up at the pharmacy they chose. The texts are *not* an attempt to generate new commercial demand or sell anything to the recipient, like in all of Plaintiff's cases.

The prescription-card fax cases—*Michigan Urgent* and *Mills Cashway*—are even further afield. *See* Opp. at 16 (citing *Michigan Urgent Care & Primary Care Physicians, P.C. v. Med. Sec. Card Co., LLC*, 2020 WL 7042945, at *2-*3 (E.D. Mich. Nov. 30, 2020); *Mills Cashway Pharmacy, Inc. v. Change Healthcare Inc.*, 2025 WL 1085816, at *3 (M.D. Tenn. Apr. 10, 2025)). To start, faxes are governed by a completely different statutory regime. *See* 47 U.S.C. § 227(b)(1)(C). And *Michigan Urgent Care* addressed a fax that explicitly promoted a savings card to doctors and urged them to order and distribute it to their patients. 2020 WL 7042945, at *2-*3. Setting aside that Mr. Newell does not plead that RxLink distributes a "discount card," RxLink's messages are ***not*** directed at physicians or otherwise connected to a marketing campaign; RxLink's messages relate to an existing doctor-ordered prescription. The fax in *Mills Cashway* promoted a specific commercial drug (Xarelto) and told patients to "'ask [their] doctor about a 90-Day supply of Xarelto,' rather than a 30-day supply or some other medication altogether, and to use the Xarelto website." 2025 WL 1085816, at *2. The defendant sought to influence prescribing decisions through its unsolicited bulk fax campaigns. *Id.* RxLink's texts do nothing of the sort.

10

RxLink's messages are far closer to the messages in the cases Mr. Newell cites where courts dismissed TCPA complaints for failing to allege a telephone solicitation. Opp. at 17–18 (citing *Hulce v. Zipongo*, 132 F.4th 493, 498 (7th Cir. 2025) and *Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 133 (3d Cir. 2019). In *Hulce*, the Seventh Circuit held that a message is not a solicitation unless it seeks to persuade the recipient to pay for the sender's services. 132 F.4th at 499–501 (*en banc* petition denied). RxLink's texts fit *Hulce* exactly: they furnish optional cost-saving information at no cost to the recipient. In fact, the facts of this case are far more persuasive than *Hulce* because the prescriptions were not written for Mr. Newell and could not lawfully be dispensed to him. *See* Br. at 15. *Mauthe* likewise rejected TCPA liability where the communication did not "convey the impression that a seller is trying to make a sale." 925 F.3d at 133–35. Nothing in RxLink's messages resembles a sales pitch or attempts to induce a transaction with RxLink. *See* Compl. ¶ 22.[4]

### D. The Healthcare and Emergency-Purpose Framework Confirms These Texts Are Informational, Not Solicitations

Although the Court need not reach the issue, the healthcare and emergency-purpose framework confirms what the messages themselves show: prescription-related notifications are informational health and safety communications, not telemarketing. *See* Br. at 16–19. Under specific delegation from Congress, the FCC has exempted prescription notices as healthcare

---

[4] The Opposition also cites *Rockwell v. Medicus Healthcare Sols.* (at 18) for the proposition that "services that appear to be free or to offer recruitment opportunities may 'serve as a mere pretext for commercial services.'" 2025 WL 959745, at *4 (W.D.N.Y. Mar. 31, 2025)). But in *Rockwell*, the court dismissed the plaintiff's complaint because he failed to plead facts showing that the defendant stood to obtain payment from the message recipient or a third party — an omission that mirrors Mr. Newell's failure to allege that RxLink would earn money if he acted on the texts. *See* 2025 WL 959745, at *5. Indeed, Mr. Newell cannot even plead that he could have filled the prescription, let alone use the discount code.

messages—even when analyzing them under § 227(b)'s broader language—which informs whether they can plausibly be "telephone solicitations" under § 227(a)(4).[5]

Mr. Newell responds that the "emergency purposes" language appears only in § 227(b) and cannot be "transplanted" to § 227(c). That misunderstands RxLink's point. RxLink is not asking the Court to graft a § 227(b) exemption onto a § 227(c) claim; it relies on this framework as persuasive context about the nature of prescription-related communications. When regulators and courts consistently describe prescription notifications as health/safety messages, that context matters in deciding whether they are informational communications or telephone solicitations.

The cases Mr. Newell cites do not say otherwise. In *Smith v. Rite Aid Corp.*, the court considered whether wrong-number prescription refill robocalls violated § 227(b), a provision that regulates all covered calls without the consent of the "called party" regardless of whether they are marketing. 2018 WL 5828693, at *3–5 (W.D.N.Y. Nov. 7, 2018). The court denied a motion to dismiss because the FCC's emergency and healthcare exceptions are affirmative defenses, and the calls did not plainly satisfy the exemption's detailed criteria at the pleading stage. *Id.* Critically, *Smith* did not hold that prescription notifications are telemarketing; to the contrary, it treated them as healthcare calls and focused only on whether the defendant could invoke an exemption to the prohibition on robocalls without consent at the pleadings stage. Section 227(c), on the other hand, applies only to telephone solicitations. So, if *Smith* were decided under § 227(c), the case would have been dismissed.

---

[5] Section 227(b) regulates all calls made with certain prohibited technologies or prerecorded content, without regard to the substance of the message. Because that subsection sweeps in all communications, Congress and the FCC created narrow exemptions, such as the "emergency purposes" and healthcare exceptions, to avoid capturing indispensable medical and safety-related calls. By contrast, § 227(c)(5) applies only to telephone solicitations, a term that Congress defined to require encouraging a purchase, rental, or investment in goods or services. 47 U.S.C. § 227(a)(4). Calls that fall within the healthcare/emergency category cannot trigger § 227(c)(5) in the first place. Put simply, § 227(b) needs an emergency exemption because it covers all calls; § 227(c) does not, because calls sent for health and safety purposes are not telephone solicitations at all.

*Michigan Urgent* is even less helpful to Mr. Newell: it involved a fax advertisement promoting a discount-card program, complete with logo, card image, and a call to "request savings cards or fliers" so doctors could distribute them to patients—conduct the court found plausibly "attract[ed] clients or customers" and affected the defendant's profits. 2020 WL 7042945, at *1–3 (E.D. Mich. Nov. 30, 2020). That analysis arose under the TCPA's fax-advertisement provision § 227(b)(1)(C), which is broader than § 227(c)(5) and does not hinge on whether the communication qualifies as a "telephone solicitation." RxLink's prescription-triggered texts look nothing like that branded, card-focused marketing campaign anyway. They contain no logo, no request to order or distribute cards, and no effort to influence prescribing decisions. *See generally* Compl. ¶ 22. They simply notify a patient that his doctor already wrote a prescription and how he might *reduce* his out-of-pocket cost at the pharmacy the physician *already sent* the script to.[6]

In short, the emergency/healthcare authorities Mr. Newell invokes reinforce RxLink's position rather than his own: prescription-related communications are informational healthcare messages, not advertisements. Classified that way, they cannot satisfy § 227(a)(4)'s requirement of encouraging a purchase—and thus cannot support a § 227(c) DNC claim. And that is *especially* true in this case, because Mr. Newell's own allegations make clear that he never sought, and therefore could not have filled, the referenced prescription; a message cannot "encourage" a purchase the recipient is literally incapable of making.

---

[6] Plaintiff also devotes considerable space to arguing that RxLink is not a HIPAA "covered entity" or business associate, but that argument misses the mark. *See* Opp. at 20. Whether RxLink qualifies as a HIPAA-covered entity is a fact-intensive inquiry that cannot be resolved at the motion-to-dismiss stage—and does not need to be. RxLink's point is not that it has proven an exemption. Rather, it is that the character of the communications— prescription notifications tied to a physician's decision to issue a prescription—are consistent with a healthcare., not telemarketing, purpose. The Complaint alleges that RxLink is a healthcare technology platform designed to connect patients and pharmacies. Compl. ¶ 16. The Complaint indicates that the messages were triggered when a doctor wrote a prescription. *See id.* ¶ 22. These are precisely the circumstances in which courts and the FCC have treated communications as healthcare related, not solicitations.

## III. CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss and dismiss the Complaint with prejudice.

Dated: December 12, 2025                Respectfully submitted,

                                        */s/ Ryan D. Watstein*
                                        Ryan D. Watstein*
                                        GA 266019
                                        ryan@wtlaw.com
                                        Oyinkansola Y. Muraina*
                                        GA 357962
                                        omuraina@wtlaw.com
                                        **WATSTEIN TEREPKA, LLP**
                                        75 14th Street NE, Suite 2600
                                        Atlanta, Georgia 30309
                                        Telephone: (404) 779-5189
                                        Fax: (404) 537-1650
                                        *Admitted pro hac vice*

                                        Matthew A. Lipman
                                        mlipman@mdmc-law.com
                                        **McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
                                        1617 JFK Boulevard, Suite 1500
                                        Philadelphia, Pennsylvania 19103
                                        Telephone: 215-557-2900
                                        Fax: (215) 557-2990

                                        *Counsel for Defendant RxLink Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2025, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Ryan D. Watstein*
Ryan D. Watstein

*Counsel for Defendant*
